IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 11, 2011

**THOMAS J. TUCKER v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Marshall County**
**No. 10CR14      Robert Crigler, Judge**

---

**No. M2010-01311-CCA-R3-PC  - Filed May 19, 2011**

---

A Marshall County jury found the Petitioner, Thomas J. Tucker, guilty of facilitation of aggravated robbery and facilitation of aggravated burglary, and the trial court sentenced him to an effective sentence of thirteen years in the Tennessee Department of Correction.  The Petitioner filed a petition for post-conviction relief, which the post-conviction court denied after a hearing.  On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because he received the ineffective assistance of counsel.  After a thorough review of the record and applicable law, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

David J. Mckenzie, Lewisburg, Tennessee, for the Appellant, Thomas J. Tucker.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Chuck Crawford, District Attorney General; Weakley E. Barnard, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Trial**

This case arises from the Petitioner's participation in breaking into the victim's home, assaulting him, and taking his handgun.  Based on this conduct, a Marshall County grand jury indicted the Petitioner for especially aggravated robbery and especially aggravated burglary.

On direct appeal, this Court summarized the underlying facts of the case as follows:

At trial, the victim, Wesley Carroll, testified that he had lived at 134 Elm Avenue in Lewisburg for approximately 10 years. He described his home as a small, one-room house with a partitioned bedroom and bathroom. The home had a front porch with both a solid front door and a storm door. Mr. Carroll explained that the solid door opened into the residence and that the storm door opened toward the outside. He testified that he knew Mr. Medley from attending high school with Mr. Medley's older brothers and that he had been acquainted with him for six or seven years. Mr. Carroll testified that he had only met [the Petitioner] on two occasions.

Mr. Carroll testified that sometime in January or February of 2007, he was browsing the internet on his home computer at approximately 3:00 or 4:00 a.m. He stated that he was having trouble sleeping and was "looking through profiles" on the internet website, www.MySpace.com ("MySpace"). He stated that Mr. Medley knocked on his door and appeared intoxicated. Mr. Carroll explained that Mr. Medley stepped into his home with [the Petitioner], whom he had not met until then. Mr. Medley asked if Mr. Carroll wanted to either buy marijuana or trade prescription pills for marijuana. Mr. Carroll responded that he did not want any marijuana, and he testified that he had not used marijuana since November 11, 2006. Mr. Carroll stated that Mr. Medley asked to use his computer to access his MySpace account but that Mr. Medley was unable to operate the computer. Mr. Medley then asked Mr. Carroll to log him into his account, and Mr. Carroll complied.

Mr. Carroll explained that MySpace is "a free public forum" on the internet where an individual creates a "profile." The profile allows an individual to "post pictures . . . , write bulletins, try to keep in touch with old friends," and "post comments about [other] people." He explained that a password and electronic mailing address are required to access and maintain a MySpace account.

Mr. Carroll testified that, while he was interacting with Mr. Medley near his computer, he noticed that he had left his wallet lying on a table near where [the Petitioner] was sitting. At one point, Mr. Carroll noticed that his wallet had been taken from the table. He testified that he "kind of hurried over to where [his] wallet was and where [the Petitioner] was sitting." He stated that [the Petitioner] had the wallet and was taking money from it. Mr. Carroll asked [the Petitioner], "[D]o you mind getting your hand out of my

wallet?" [The Petitioner] then rushed toward Mr. Carroll, struck him in the jaw, and placed him in a "choke hold."

Mr. Carroll testified that he repeatedly asked Mr. Medley to stop [the Petitioner]. He said that Mr. Medley then walked behind him and that he heard Mr. Medley and [the Petitioner] whispering behind his back. Mr. Carroll testified that he overheard [the Petitioner] say, "I thought you told me to," and that Mr. Medley responded inaudibly. Mr. Carroll testified that [the Petitioner] then said, "[T]his is how we are going to do this. I am going to give you your money back, and don't you swing on me when you get up. I am going to get out of here. I am going to walk away." Mr. Carroll stated that [the Petitioner] then released him and threw his money on the floor. [The Petitioner] left while Mr. Medley remained in the home. Mr. Carroll testified that he then stared at Mr. Medley "with hate in [his] eyes" and that Mr. Medley appeared "ill at [him] for the way [he] was looking at him." Mr. Medley then left.

Mr. Carroll testified that, about five minutes after the [two men] left his home, he counted the money that [the Petitioner] had thrown on the floor and noticed that he was missing approximately $80 from the $300 in his wallet. After discovering that Mr. Medley had failed to log off his MySpace account, Mr. Carroll decided to "get even" with Mr. Medley. Mr. Carroll "wrote all kinds of vulgar, derogatory statements" alleging that Mr. Medley was a homosexual. Mr. Carroll then changed the password for Mr. Medley's MySpace account so that he could no longer access his MySpace profile.

Mr. Carroll testified that, between 2:30 and 3:00 a.m. on March 19, 2007, he was at his home playing a video game and falling asleep when he heard "[a] kick, a boom" at his door. Upon hearing another, louder kick, Mr. Carroll awoke and stood up. Mr. Carroll testified that after hearing a third kick, his door opened and that Mr. Medley came through the door. Mr. Carroll stated that a man wearing a mask accompanied Mr. Medley. Mr. Carroll testified that the second man later removed the mask, and he identified him as [the Petitioner].

Mr. Carroll stated that Mr. Medley held a wooden stick, pried from some furniture sitting on Mr. Carroll's front porch. Mr. Medley hit him across his ear and then "continually beat [Mr. Carroll] with the stick." Mr. Carroll then fell onto his coffee table, breaking it. Mr. Carroll testified that he fell on his back and that [the Petitioner] held his feet as Mr. Medley

-3-

jumped on him and "reared back" to punch him. Mr. Carroll explained that Mr. Medley was "ranting" about what Mr. Carroll did to his MySpace profile. Mr. Carroll testified that, after he "reared back," Mr. Medley apparently decided not to strike him again and let him stand.

At that point, Mr. Carroll ran toward his bedroom to find his portable telephone. He testified that [the Petitioner] then pulled off his mask and said, "Hold on. We don't know what he has got in here. Let's search this place." Mr. Carroll then "just froze" and observed [the Petitioner] remove a .25 caliber handgun from Mr. Carroll's desk. Mr. Carroll testified that the pistol once belonged to his grandfather and was very old. He did not know whether the gun functioned. [The Petitioner] pulled back the slide of the pistol and observed a bullet. Mr. Carroll explained that the bullet was a .22 caliber rimfire bullet, although the pistol was a .25 caliber center-fire weapon. He stated that [the Petitioner] asked, "You trying to kill us?" Mr. Carroll testified that [the Petitioner] pulled out a pocket knife and said, "Let's gut this MFer." Mr. Carroll testified that Mr. Tucker struck him with the gun and "jabb[ed]" the knife in his direction several times, although Mr. Carroll stated that he did not believe [the Petitioner] was attempting to stab him.

Mr. Carroll testified that he then hit the "page" button on the base unit of his cordless telephone to determine the location of the telephone's portable receiver. He heard the receiver beeping in his bathroom, and he fought with Mr. Medley to get to the telephone receiver. Mr. Carroll testified that Mr. Medley attempted to take the receiver from his hands but that Mr. Carroll managed to emulate dialing 9-1-1. He testified that the defendants left upon observing him dialing the telephone and that, after they left, he called 9-1-1 to report the home invasion. He stated that [the Petitioner] took the pistol with him when he left.

Mr. Carroll stated that law enforcement officers arrived at his home within five minutes and that he informed the officers of the identity of his assailants. The police then transported him to the hospital. Mr. Carroll testified that he received three or four stitches on his face, eight or nine stitches on his ear, and that his head was "busted." He testified that he suffered extreme pain for three weeks following the incident and that he had periodic headaches for several months after the altercation. Mr. Carroll displayed scarring from the incident.

On a later date, Mr. Carroll positively identified [Mr. Medley and the

Petitioner]from photographic line-ups arranged by law enforcement officers. Mr. Carroll testified that, during the altercation, he was in fear of bodily injury. He also testified that he did not give either [man] consent to enter his home or take his pistol on March 19, 2007. On cross-examination, he testified that he had visited the hospital four or five times since the alteration.

Officer James Johnson of the Lewisburg Police Department testified that he received a call on March 19, 2007, to investigate Mr. Carroll's home. He stated that he arrived at the scene within a minute of receiving the call from his dispatching officer. Upon arriving at approximately 3:00 a.m., he interviewed Mr. Carroll, who informed him that [the Petitioner] and Mr. Medley entered his home "unwelcomed" and assaulted him. Officer Johnson testified that he observed "obvious lacerations" on the victim and that he arranged for him to be transported to Marshall County Medical Center's emergency room.

Officer Johnson testified that the front door of the home had been forced open. He stated that the inside of the home looked as though a struggle had occurred. He said that blood was located throughout the home and that the furniture appeared damaged and misplaced. Officer Johnson reported the incident to the on-call detective, Dac Burrow, and he requested other officers to be on the lookout for [Mr. Medley and the Petitioner].

Detective Burrow of the Lewisburg Police Department testified that he met with the victim, Mr. Carroll, at the police department and recorded a statement from him. He stated that he visited the scene of the crime at approximately 9:00 a.m. on March 19, 2007, and that he observed the victim's father repairing the front door. He collected from the scene a piece of wood, allegedly used to strike Mr. Carroll, and the victim's bloody tee shirt.

Detective Burrow created a six-photograph line-up for each defendant, and Mr. Carroll positively identified both Mr. Medley and [the Petitioner] as his assailants.

Detective Burrow interviewed Mr. Medley in the afternoon of March 19, 2007. He testified that Mr. Medley signed a waiver of his Miranda rights and that he first denied any knowledge of the burglary at Mr. Carroll's home. Mr. Medley told Detective Burrow that he had been working with his mother at the time of the crime. Detective Burrow then observed scratches on Mr. Medley's face and brought them to Mr. Medley's attention. Detective Burrow

testified that Mr. Medley then gave a statement that he transcribed. The statement reflected that, at approximately 3:00 a.m. on March 19, 2007, Mr. Medley went to Mr. Carroll's house to speak with him about his changing Mr. Medley's MySpace account and password. Mr. Medley told Detective Burrow that he knocked on the front door and that Mr. Carroll answered and stepped onto the front porch. Mr. Medley's statement represented that Mr. Tucker stayed in the vehicle at this time. Mr. Medley maintained that he told Mr. Carroll that he knew that he had altered his MySpace account.

> We then began to argue and then we shoved each other a couple of times and then [Mr. Carroll] swung at me and we started fighting. As we were fighting I tackled [Mr. Carroll] and we wound up inside his house and I was more trying to hold [Mr. Carroll] down and asking him why he changed my account. At one point I saw [Mr. Carroll] run toward [the Petitioner] and [the Petitioner] got him in the head lock and they were scuffling around. I never hit [Mr. Carroll] with anything and I didn't see [the Petitioner] hit [Mr. Carroll] with anything nor did [Mr. Carroll] hit us with anything as far as I know. At one point [Mr. Carroll] acted like he was rushing to get something and I thought that he was trying to get a pistol. At one point I saw [Mr. Carroll's] ear bleeding and that's when I really tried to hold [Mr. Carroll] down and telling him to calm down and asking him why did he do it. [Mr. Carroll] then got to a phone and was calling someone and that's when I said let's go. [The Petitioner] and I then got into my car . . . and I dropped [Mr. Tucker] off at his friend[']s house and I then went home to Murfreesboro.

The statement reflected that Mr. Medley permitted Detective Burrow to transcribe his account of the March 19, 2007 incident. Detective Burrow testified that he spoke with [the Petitioner] on March 26, 2007, and that he arrested him on that day for the pending charges.

Heath Brandon Morgan testified that he had known Mr. Medley for six or seven years and that, although the two were once "kind of good friends," they had "went [their] separate ways." Mr. Morgan testified that he had been "good friends" with Mr. Carroll for approximately two years. Mr. Morgan testified that sometime in January or February of 2007, he was at his home with his friends Timothy Pringle and Josh Green. He stated that Mr. Medley

was also present and that he "made a statement that he was going to F Mr. Wesley Carroll up for getting []hold of his MySpace and changing that he was gay or homosexual."

Timothy Pringle also testified that he had known Mr. Medley for "quite some time" and that he and Mr. Carroll were "good friends." Mr. Pringle testified that, while at Mr. Morgan's home sometime in February of 2007 he overheard Mr. Medley speak about Mr. Carroll. Mr. Pringle said, "[Mr. Medley] said that pretty much he would F [Mr. Carroll] up for messing with his MySpace and calling him a homosexual or queer and he was pretty ticked off and he said [Mr. Carroll] got him for a DUI and called the police. . . . He was pretty upset."

Jeremy Richardson testified that he was incarcerated at the Marshall County Jail where he overheard a conversation between [the Petitioner] and other inmates. He testified that somebody asked [the Petitioner] why he was imprisoned and that [the Petitioner] responded that he had robbed Wesley Carroll and had taken his .25 caliber pistol. Mr. Richardson testified that his grandmother was a friend of Mr. Carroll's grandmother, so he informed Mr. Carroll of the conversation after being released on bond.

After the State rested, the defense called Doctor Tom Mitchell, Mr. Carroll's treating emergency room physician at Marshall County Medical Center. Doctor Mitchell testified that Mr. Carroll suffered lacerations to his left eyebrow, left ear, and the back of his head. Doctor Mitchell recalled that Mr. Carroll indicated that he had been struck with a wooden stick. He testified that the victim did not suffer any noticeable injury to his skull or brain.

Doctor Mitchell testified that, upon arrival, Mr. Carroll testified that he was suffering pain ranked as a "10" on a pain scale ranking from "0" as the lowest to "10" as the highest. Doctor Mitchell noted that, after his initial admittance to the hospital, Mr. Carroll ranked his pain as an "8." By the time the victim was discharged, and after his taking hydrocodone and local anesthetic, he reported his pain as "0." Doctor Mitchell testified that, based on these circumstances, Mr. Carroll suffered mild to moderate pain.

Doctor Mitchell testified that Mr. Carroll suffered no substantial risk of death or loss of function due to his injures. He testified that Mr. Carroll possibly suffered some undetectable injuries to the brain that generally cause

headaches; however, he noted that such headaches do not last more than two weeks except severe injuries.

Brenda Cozart, Mr. Medley's cousin, testified that she, her husband, and her sister-in-law actively used MySpace and that she observed Mr. Medley's profile after Mr. Carroll altered it. She testified that she posted a comment on Mr. Medley's MySpace page criticizing his display of Disney's "Little Mermaid" in its background. She testified that Mr. Medley's account, under Mr. Carroll's control, then posted a comment calling her a "B* * * *." She also testified that she observed the postings on Mr. Medley's MySpace profile demeaningly portraying him as a homosexual.

Mr. Medley, the defendant, testified that he had known Mr. Carroll for approximately 11 years, had been to his house several times, and had smoked marijuana with him. Regarding the January or February 2007 visit described by Mr. Carroll, Mr. Medley explained that he and [the Petitioner] had been drinking in Chapel Hill and "wanted to get high." He admitted that he "had a little buzz." He testified that he knew that Mr. Carroll had marijuana and that he went to his house to obtain some. He stated that they knocked on Mr. Carroll's front door and that Mr. Carroll let them into his home.

Mr. Medley testified that he spoke with Mr. Carroll about "smoking pot" and that Mr. Carroll showed him and [the Petitioner] some marijuana lying on a table. Mr. Medley testified that he requested Mr. Carroll to log him onto his MySpace account and that [the Petitioner] "roll[ed] a blunt" during this time. Mr. Medley stated that [the Petitioner] dropped the marijuana on the floor and that "[Mr. Carroll] ran in there acting crazy because he thought [the Petitioner] was trying to take some of his weed." He explained that Mr. Carroll had "[h]igh grade weed."

He stated that [the Petitioner] then punched Mr. Carroll and placed him in a "head lock." Mr. Medley testified that he broke the two up and that he told Mr. Carroll that he "was sorry for bringing something like that to his house." Mr. Medley stated that he instructed [the Petitioner] to go to his car. He said that Mr. Carroll then asked him to leave and that he complied. He was arrested for driving under the influence later that evening.

Mr. Medley testified that approximately three days later he discovered that his MySpace profile had been altered and contacted the Marshall County Sheriff's Department. He testified that he was not a homosexual and that he

took offense to the comments on his profile. He stated that he was very angry over the situation and that, as time passed, he became more angered. Mr. Medley estimated that between 25 and 30 people contacted him regarding the changes to his MySpace profile.

Mr. Medley testified that, on March 19, 2007, he "got a little buzz[ed] [and] wanted to go confront [Mr. Carroll] about [his] MySpace." He testified that he went to Mr. Carroll's home, knocked on the door, and Mr. Carroll came onto his front porch. Mr. Medley stated that Mr. Carroll denied changing his MySpace profile, so Mr. Medley "got loud with him." He testified that Mr. Carroll pushed him and that he pushed back. He stated that Mr. Carroll then retreated into his home, shutting the door on Mr. Medley. Mr. Medley stated that he then kicked in the door, went into his home, and "whipped his ass."

He stated that, upon going into the home, the two men landed on, and broke, the coffee table. During this fighting, Mr. Carroll grabbed Mr. Medley's foot, ripping off his shoe and sock. Mr. Medley stated that he was on top of Mr. Carroll when he realized that Mr. Carroll was bleeding "pretty bad." He testified that he then got off of Mr. Carroll. During that time, [the Petitioner] entered the home. Mr. Medley testified that Mr. Carroll rushed toward [the Petitioner] but that [the Petitioner] restrained him. Mr. Medley stated that, after [the Petitioner] released him, Mr. Carroll ran into his bedroom to grab "something black." He testified that he could not identify the black object and feared it was a handgun, so he wrestled with Mr. Carroll over the object. After realizing the black object was a telephone, he and [the Petitioner] left the home. He testified that neither he nor [the Petitioner] took anything from the home. He further maintained that he never used any wooden weapon or knife to harm or threaten Mr. Carroll.

Mr. Medley testified that, later on March 19, 2007, he turned himself in to the Lewisburg Police Department. He stated that he expected to be arrested for "[a]ssault, trespassing[,] [m]aybe breaking and entering." Mr. Medley said that he was surprised when Detective Burrow informed him that he was charged with especially aggravated robbery and especially aggravated burglary. He maintained that this frightened him, which caused him to lie to Detective Burrow about being at work with his mother. Mr. Medley stated that he subsequently told the true story to Detective Burrow because he "knew [he] was going to get in trouble about it anyway." He said, "I committed the crime. I mean, I assaulted [Mr. Carroll]."

Mr. Medley stated that he gave a full account of the incident to Detective Burrow and that Detective Burrow failed to include some of the details in the written confession. He stated that he told Detective Burrow that [the Petitioner] exited the car once he observed Mr. Medley and Mr. Carroll fighting; however, this was not included in the statement.

Regarding the conversation with Mr. Morgan, Mr. Pringle, and Mr. Green at Mr. Morgan's home, Mr. Medley testified that the three men brought up the subject of his altered MySpace profile. He stated that the men laughed about the matter. Mr. Medley testified that this angered him and that he told them, "I would whip his ass right now if he was right here."

Mr. Medley testified that, in the early-morning hours of March 19, 2007, [the Petitioner] had no knowledge that Mr. Medley was going to break the door of Mr. Carroll's home and that [the Petitioner] did not help with the assault. He said that [the Petitioner] only helped to break up the fight between him and Mr. Carroll. He stated that he never saw [the Petitioner] with either a gun or knife. He maintained that he and [the Petitioner] did not plan to commit any crimes upon going to Mr. Carroll's house. He acknowledged that [the Petitioner] knew that Mr. Medley wanted to "whip [Mr. Carroll's] ass" but that he would not have hurt Mr. Carroll had he talked with him "like a normal person."

[The Petitioner] chose not to testify.

*State v. Brandon Corey Medley and Thomas Jackson Turner*, No. M2008-01286-CCA-R3-CD, 2009 WL 1676051 (Tenn. Crim. App., at Nashville, June 16, 2009), *perm. app. denied* (Tenn. Oct. 19, 2009). The jury convicted the Petitioner of facilitation of aggravated robbery and facilitation of aggravated burglary, and the trial court sentenced him to ten years for the facilitation of aggravated robbery conviction and thirteen years for the facilitation of aggravated burglary conviction. The trial court ordered the sentences to be served concurrently, for an effective sentence of thirteen years in the Tennessee Department of Correction.

### B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief claiming that he received the ineffective assistance of counsel. The post-conviction court held an evidentiary hearing

wherein the following evidence was introduced[1]: The Petitioner testified that he was indicted for especially aggravated robbery and especially aggravated burglary, but the jury convicted him of facilitation of aggravated robbery and facilitation of aggravated burglary. The Petitioner recalled that he was represented by the Public Defender's Office during trial and on direct appeal. When his direct appeal was denied, he was notified by the Public Defender's Office that they could no longer represent him and that he had sixty days to file for permission to appeal the denial to the Tennessee Supreme Court. The Petitioner said that he only dealt with one attorney, Counsel, from the Public Defender's Office during this time.

The Petitioner testified that both he and his co-defendant asked their attorneys to request a severance of their cases but that they were told that "it would be better for them to work together, that it is in [the Petitioner's] best interest to keep [the cases] together." The Petitioner said that he expressed his concern about trying the case with his co-defendant because he knew his co-defendant was going to testify and admit some degree of guilt, which the Petitioner thought would cast doubt upon his claim of innocence. Counsel told him it was advantageous to try them together, so the Petitioner "went along" with Counsel's advice. The Petitioner agreed Counsel never threatened him about this decision but instead informed him that the cases should be tried together.

Counsel testified that he was appointed to the case after the Petitioner's preliminary hearing. Counsel did not recall who represented the Petitioner at the preliminary hearing, but he read a transcript of the preliminary hearing in preparation for the Petitioner's trial. Counsel first met with the Petitioner when he was appointed on the arraignment date. The Petitioner entered a plea of not guilty and Counsel requested a continuance in order to conduct an investigation. Counsel reviewed a copy of the indictments and researched the felony classification of the charges. Counsel then communicated to the Petitioner the nature of the offenses as well as the range of punishment for the offenses.

Counsel testified that he, the Petitioner, the Petitioner's co-defendant, and Ms. Thomas, the co-defendant's attorney, met and talked about severance of the cases. Counsel testified that the Petitioner and his co-defendant wanted the cases to be tried jointly because the co-defendant was going to testify that the Petitioner had a very limited role in this incident. There was also discussion that the Petitioner's co-defendant might make a better witness than the Petitioner at trial. Counsel said that it was the Petitioner who suggested the

---

[1] In his petition for post-conviction relief, the Petitioner alleged several issues in which he asserted Counsel was ineffective. On appeal, however, he maintains only one of these, that Counsel was ineffective for failing to file a motion to sever. As such, we omit claims asserted within the petition for post-conviction relief and testimony concerning allegations of ineffectiveness that the Petitioner does not maintain on appeal.

cases be tried together. Normally, Counsel did not prefer to try cases jointly, but after meeting with both the Petitioner and his co-defendant, he "didn't think it was going to be a bad idea, because [the co-defendant] did seem to be more articulate than [the Petitioner], and [the co-defendant] was going to get up there and take the brunt of the blame." Counsel said that he did not recall the Petitioner ever saying he was concerned about the cases being tried together or wanting the cases to be severed. Counsel testified that he thought, in retrospect, that trying the cases together benefited the Petitioner because the focus of the trial was on the co-defendant rather than the Petitioner.

Counsel testified that he believed he had "adequate experience and knowledge of the legal system" when he tried the Petitioner's case. He said that he had tried at least thirty cases at the time of the Petitioner's trial and handled several hundred criminal defense cases.

On cross-examination, Counsel agreed that the Petitioner was convicted of lesser charges than those with which he was indicted and that the Court of Criminal Appeals affirmed those convictions.

Melissa Thomas testified that she represented the Petitioner's co-defendant in this case. Thomas recalled that her client had told her that he wanted the cases to be tried together because "he felt sorry for [the Petitioner]" and felt the Petitioner was "much less culpable." Thomas said that her client wished to "help [the Petitioner] out any way he could." Thomas said that she and her client met with the Petitioner and Counsel and that they all agreed that they would not seek a severance in this case.

Thomas believed that jointly trying the cases benefited the Petitioner. She said that her client did "a good job of testifying," which she believed resulted in both defendants receiving lesser convictions. Had the cases been tried separately, she explained, the Petitioner would not have benefited from his co-defendant testifying on his behalf, and the Petitioner "would probably be looking at a greater sentence than what he had now." Thomas said she did not recall ever hearing the Petitioner express any concern about trying the cases jointly.

Based upon this testimony, the post-conviction court denied post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations

in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court

should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In this case, the post-conviction court first recited the Petitioner's co-defendant's statements to police, which limited the Petitioner's role, and made the following findings:

So [the Petitioner], in effect, got the benefit of a favorable witness, that being [the co-defendant], . . .[the co-defendant's] testimony . . . tr[ies] to exonerate [The Petitioner].

. . . .

[The co-defendant] took the brunt of the criminality in this case.

-14-

[The Petitioner] got to do that without taking the witness stand. [The Petitioner has a lengthy record that [his co-defendant] didn't have.

Furthermore, I accredit [Counsel's] testimony that they reasoned that [the co-defendant] would be a more articulate witness than would [the Petitioner].

[ ] [The co-defendant's] testimony on the witness stand, there was one leading question where [the Petitioner] said he didn't agree with, but, quite frankly, from the totality of [the co-defendant's] testimony, I find that [Counsel] discussed this with him, the idea of trying them together or severing them. The [Petitioner] felt like [Counsel] knew what was best and went along with that, and I think [Counsel] knew what was best.

We conclude that the record supports the post-conviction court's findings of fact. Upon review of the record, we further conclude that the Petitioner has failed to establish by clear and convincing evidence that Counsel was ineffective for failing to file a motion to sever. The Petitioner asserts that he requested that Counsel file a motion to sever. Other than this bare assertion he now makes on appeal, there is no proof in the record to support this contention. The evidence shows that the Petitioner met with Counsel, his co-defendant, and his co-defendant's attorney, Ms. Thomas. The Petitioner's co-defendant "felt sorry" for the Petitioner and was willing to testify on the Petitioner's behalf that the Petitioner's role was very limited in this incident. Counsel testified that the Petitioner's co-defendant was more articulate than the Petitioner and thus would make a better witness before the jury. Everyone agreed at the end of the meeting that trying the cases jointly would be beneficial for the two defendants. Both Counsel and Thomas testified that the Petitioner never mentioned any concern about trying the cases jointly. Moreover, the co-defendant's testimony at trial considerably narrowed the Petitioner's role in the robbery and burglary. The co-defendant maintained throughout his testimony that the Petitioner did not know the co-defendant was going to break into the victim's house, did not help the co-defendant assault the victim "in any way," and did not use or display a weapon or take anything from the victim's house. The co-defendant testified that the Petitioner only entered the victim's house in an attempt to break up the fight between the co-defendant and the victim. The jury ultimately found the Petitioner guilty of lesser included offenses of both counts.

Based upon this evidence, we conclude that Petitioner has failed to show by clear and convincing evidence Counsel was ineffective for failing to file a motion to sever or that he was prejudiced by this conduct. The Petitioner is not entitled to relief as to this issue.

-15-

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied the Petitioner's petition for post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE